IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FRANK S. NIEWIERSKI,                          )
                                              )
                     Plaintiff,               )          Civil Action No. 09-776
           v.                                 )
                                              )
                                              )
MICHAEL J. ASTRUE, COMMISSIONER               )
OF SOCIAL SECURITY                            )
                                              )
                     Defendant.               )

<u>MEMORANDUM OPINION</u>

CONTI, District Judge

*Introduction*

Frank Niewierski ("plaintiff" or "Niewierski") appealed from the final decision of the Commissioner of Social Security ("defendant" or "Commissioner") denying claims for social security disability insurance benefits ("DIB") under Title II of the Social Security Act (the "SSA"), 42 U.S.C. §§ 401-33 and supplemental security income ("SSI") under Title XVI of the SSA, 42 U.S.C. §§ 1381-83. Plaintiff contends that the decision of the administrative law judge (the "ALJ") that he is not disabled, and therefore not entitled to benefits, should be reversed because the decision is not supported by substantial evidence. Defendant asserts that the decision of the ALJ is supported by substantial evidence. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The court will deny the motions for summary judgment and will remand the case for further proceedings consistent with this opinion because the decision of the ALJ is not supported by substantial evidence.

## *Procedural History*

Niewierski filed the application at issue in this appeal on April 10, 2007, asserting a disability since March 16, 2007 due to arteriovenous malformations, telangiectasias and severe anemia. (R. at 14, 46, 50.)  On August 17, 2007, plaintiff's claims were initially denied. (R. at 39-43.)  A timely written request for a hearing before an administrative law judge was filed by plaintiff, and the hearing was held on June 11, 2008. (R. at 431-63.)  Plaintiff, who at that time was fifty-two years of age, appeared with counsel and testified at the hearing. (*Id.*)  A vocational expert (the "VE") also testified. (R. at 459-62.)  In a decision dated November 10, 2008, the ALJ determined that plaintiff was not under a disability within the meaning of the SSA. (R. at 14-23.)  The ALJ determined plaintiff had severe and nonsevere impairments; however, plaintiff had the residual functional capacity to perform light work activity. (R. at 16-23.)  Plaintiff filed a timely request to review the ALJ's decision, which was denied by the Appeals Council on May 8, 2009. (R. at 5-7.)  Plaintiff filed this action seeking judicial review.

## *Plaintiff's Background, Medical Evidence and Testimony*

### *Background*

Niewierski was born on November 24, 1955 and has a tenth grade education. (R. at 95.) Plaintiff worked as a millwright for a steel manufacturer for approximately thirty-one years. (R. at 60.)  Plaintiff had several unsuccessful work attempts after he stopped working as a millwright, including a  probationary period as a airplane refueler which was extended because he was not progressing in his job duties and needed to be more energetic. (R. at 94.)

In the questionnaire of plaintiff's activities of daily living Niewierski stated that he lives in a house alone where he is able to clean and cook for himself, care for a pet, shop for himself, visit

his mother, straighten up a little and watch television. (R. at 83.) Plaintiff stated that his sleep is disturbed by stomach cramps, migraines and nausea. (R. at 84.) Plaintiff does not do yard work because of shortness of breath and fatigue. (R. at 86.) He stated that any type of physical activity fatigues him severely and that he must rest when walking up steps. (R. at 88.) Plaintiff also stated in the questionnaire that he has migraines that occur two to three times a day. (R. at 90.) He stated that the headaches radiate throughout his head and last for an hour at a time. (R. at 92.) Plaintiff stated that his fatigue began in 2001 along with internal bleeding. (R. at 91.) Plaintiff takes Vicodin[1] for pain, but he reported that its effectiveness is inconsistent. (R. at 93.) He stated that he has constant fatigue that is only relieved with blood transfusions. (R. at 91.) In the past, plaintiff received three to four units of blood during a transfusion. (R. at 90.)

*Medical Evidence*

Plaintiff was admitted to the emergency department of Allegheny General Hospital on October 25, 2002, having complaints of headaches. (R. at 270.) It was reported by plaintiff that he took aspirin, but he continued to have a headache for twelve hours and had blurred vision in his right eye. (R. at 272.) Plaintiff complained about increasing headaches over the past three years that are gradual in onset and cause nausea and blurred vision. (R. at 274.)

On November 14, 2002, plaintiff had a radiology consultation that had no abnormalities. (R. at 239.) Plaintiff was seen at Allegheny General Hospital's emergency room on November 18, 2002, due to his low blood count. (R. at 240.) Plaintiff reported migraines along with weakness, fatigue, difficulty sleeping, and paleness. (*Id.*) A heart murmur since childhood was reported. (*Id.*) Dr.

---

[1] Vicodin is a "[h]ydrocodone bitartrate and acetaminophen" and "is an opioid analgesic and antitussive ...." *Physician's Desk Reference* 529 (63rd ed. 2009). Adverse side effects of Vicodin include "lightheadedness, dizziness, sedation, nausea and vomiting." *Id.*

Mara Aloi examined plaintiff, reporting that Niewierski had chronic migraines for two years and had recently begun taking Depakote.[2] (R. at 260, 262.) Plaintiff indicated that his migraines had become well controlled; however, he now had abdominal cramps, mild nausea and darkening stool. (R. at 260.) It was noted that plaintiff had a history of anemia. (R. at 261.) Plaintiff's blood work revealed that his hemoglobin was 5.9[3] and Dr. Aloi had plaintiff treated with Protonix.[4] (*Id.*) Plaintiff was admitted for further work up. (*Id.*) Dr. Aloi diagnosed plaintiff with microcytic anemia and abdominal pain of uncertain origin. (R. at 261-62.)

Dr. Danny Palmieri examined plaintiff on November 19, 2002. (R. at 255.) Dr. Palmieri noted that plaintiff had recently started taking Depakote for migraines prior to which he was taking a large amount of Advil. (*Id.*) Blood work indicated that plaintiff was severely anemic with a hemoglobin of 5.6. (*Id.*) Plaintiff complained about gradual fatigue and weakness increasing over past weeks as well as paleness and chronic epigastric pain. (*Id.*) Plaintiff lost over twenty pounds in the past year and one-half, which was a significant amount of weight. (R. at 256.) It was Dr. Palmieri's assessment that plaintiff likely had a slow gastrointestinal bleed that was causing his severe anemia and his plan was to stop the Depakote and use Vicodin for the migraines. (R. at 256-57.) Dr. Palmieri agreed with continuing blood transfusions and prescribing Protonix. (*Id.*)

---

[2]Depakote is "indicated for the treatment of acute manic or mixed episodes associated with bipolar disorder," "complex partial seizures" and "migraine headaches." *Physician's Desk Reference* 424 (63rd ed. 2009). Adverse side effects of Depakote include "nausea, somnolence, dizziness, vomiting, . . . rash." *Id.* at 423.

[3]Hemoglobin "is a protein in red blood cells that carries oxygen. A blood test can tell how much hemoglobin you have in your blood. . . . Normal results vary, but in general are: Male: 13.8 to 17.2 gm/dL; Female: 12.1 to 15.1 gm/dL." http://www.nlm.nih.gov/medlineplus/ency/article/003645.htm (last visited 8/27/10).

[4]Protonix "is indicated for the short-term treatment . . . in the healing and symptomatic relief of erosive esophagitis." Protonix is also "indicated for maintenance of healing of erosive esophagitis and reduction in relapse rates of daytime and nighttime heartburn symptoms." *Physician's Desk Reference* 3255 (63rd ed. 2009). Adverse side effects of Protonix in long term trials include "[h]eadache", "[a]bdominal pain", "[n]ausea" and "[v]omitng." *Id.* at 3256.

On November 19, 2002, plaintiff was seen by Dr. Ricardo Mitre. (R. at 104.) Dr. Mitre stated that plaintiff had severe iron deficiency anemia that was likely secondary to intermittent GI blood loss. (*Id*.) Dr. Mitre performed a panendoscopic examination of plaintiff on November 20, 2002, and found gastric and duodenal ulcers, as well as vascular malformations that were potential sources of the GI bleeding and anemia. (R. at 106-7.) A colonoscopy performed on November 21, 2002, indicated only nonbleeding internal hemorrhoids, but no other lesions to account for plaintiff's anemia. (R. at 108-9.)

Progress notes dated November 19, 2002, indicated that plaintiff received blood and was given Vicodin for his headaches and that he continued to feel tired. (R. at 243.) An examination of plaintiff detected a heart murmur. (*Id*.) Progress notes from November 20, 2002, indicated that plaintiff was feeling better, except for a nosebleed and that the Vicodin was effective for his headaches. (R. at 246.) Progress notes from November 21, 2002, reflected that plaintiff had no major complaints and that his hemoglobin was 9.6 and his stool was positive for blood. (R. at 248.) It was noted that the endoscopy revealed multiple ulcers in the stomach and duodenum as well as arterial venous malformations ("AVMs")[5] in the duodenum. (*Id*.) Plaintiff was given four units of red blood cells and continued on Vicodin and Protonix. (*Id*.) In progress notes from November 22,

---

[5]     An arterio-venous malformation, or AVM, is an abnormal collection of blood vessels. Normally, oxygenated blood is pumped by the heart through branching tubes called arteries to the brain, where it enters a fine network of tiny vessels called capillaries. It is in these capillary beds where the blood nourishes the tissues. The "used" (deoxygenated) blood passes back to the heart through branching thin walled tubes called veins. Arterial-Venous Malformations are areas that lack the tiny capillaries. The location of the connection between the artery and the vein is called the shunt. The area of tissue is called a nidus of the AVM. An AVM can be thought of as a "Short Circuit" where the blood does not go to the tissues but is pumped through the shunt and back to the heart without ever giving nutrients to the tissues.

http://www.cumc.columbia.edu/dept/cerebro/AVM.htm (last visited 8/27/10).

2002, it was reported that plaintiff was feeling "pretty good," although the colonoscopy revealed nonbleeding internal hemorrhoids. (R. at 250.) Plaintiff was discharged from Allegheny General Hospital on November 22, 2002, and proscribed Protonix, iron sulfate, vitamin C and Vicodin as needed. (R. at 194-97.)

On November 25, 2002, plaintiff had an MRI and MRA scan of his head performed. (R. at 235.) Generalized atrophy was found with the MRI and the MRA scan was normal. (R. at 235-36.)

Plaintiff was seen at the emergency room of Allegheny General Hospital on June 26, 2003, due to increasing shortness of breath and weakness. (R. at 224.) Plaintiff's hemoglobin was 3.8 and he was admitted for further work up and a blood transfusion. (R. at 224-25.) On June 27, 2003, Dr. Mitre performed an endoscopy on plaintiff, finding more than fifty AVMs in his stomach and duodenum. (R. at 192-93.) Dr. Mitre stated that more AVMs were bound to be throughout the small bowel and that he would start plaintiff on Sandostatin[6] and repeat the entroscopic examination in two months. (R. at 193.) The discharge report indicates that plaintiff received four units of blood and his hemoglobin increased to 8.6. (R. at 220.)

Certified registered nurse practitioner Joan Latsko and Dr. Richard Shadduck noted on September 22, 2003, that plaintiff had no new symptoms and that plaintiff reported he was able to work full time and overtime without a major noticeable difference in his activity tolerances. (R. at 112.) It was noted that his skin had small pinpoint spots of erythema which are suggestive of

---

[6]Sandostatin is "used to treat the symptoms associated with metastatic carcinoid tumors (flushing and diarrhea), and Vasoactive Intestinal Peptide (VIP) secreting adenomas (watery diarrhea). *Physician's Desk Reference* 2300 (63rd ed. 2009). Adverse side effects of Sandostatin include: "gallbladder abnormalities, especially stones and/or biliary sludge . . . diarrhea, loose stools, nausea and abdominal discomfort." *Id.* 2301.

telangiectasia.  (*Id*.)  Plaintiff's previous blood work was not completed due to insurance issues and follow-up was ordered. (*Id*.)

On February 18, 2004, plaintiff had an MRI of his brain performed.  (R. at 216-17.)  The MRI indicated an artifact in the right periorbital area which would be consistent with a foreign body object and an old tiny left cerebellar infarct, but otherwise no evidence of stroke or hemorrhage was found. (*Id*.)

On October 24, 2005, plaintiff reported to Allegheny General Hospital's emergency room because his hemoglobin was 7.5.  (R. at 115.)  Plaintiff stated that he was bleeding into his bowel on occasion and had red marks on his face which suggested hereditary hemorrhagic telangiectasia[7]. (*Id*.)  Plaintiff's hemoglobin was in the 5s and he was admitted and ordered two units of blood. (*Id*.) Plaintiff reported to Dr. Mitre that he had recently begun to have a progressive change in his bowel movements with darkening stools and increasing pallor.  (R. at 116.)  It was reported that plaintiff was still affected with severe migraine headaches for which he took Vicodin.  (*Id*.)  Plaintiff stated that he may take more than three Vicodin in one day and when he runs out he then takes Ibuprofen. (*Id*.)  Dr. Mitre stated that hereditary telangiectasia was a strong consideration since plaintiff's father and sister also had AVMs and bleeding episodes. (*Id*.)  Dr. Mitre expressed concern about plaintiff's treatment of his migraine headaches with Ibuprofen which could be a triggering factor for his AVM. (R. at 116-17.)  4An endoscopy performed on October 25, 2005, indicated that plaintiff had AVM and erosions in the stomach and duodenal loop with one that was actively bleeding.  (R. at 117-19.)

---

[7]Hereditary hemorrhagic telangiectasia is "a disease with onset usually after puberty, marked by multiple small telangiectases and dilated venules that develop slowly on the skin and mucous membranes; the face, lips, tongue, nasopharynx, and intestinal mucosa are frequent sites, and recurrent bleeding may occur; . . . ." *Stedman's Medical Dictionary* (28th ed. 2006).

Dr. Mitre stated that there were likely many more lesions throughout the small bowel. (R. at 118.) Plaintiff was discharged on October 27, 2005. (R. at 113-14.) The discharge report stated plaintiff had increasing shortness of breath with exertion and could not climb more than fifteen to eighteen steps. (R. at 113.) He had generalized weakness and migraine headaches with nausea and vomiting. (*Id*.) Plaintiff had the AVM in his stomach and duodenum cauterized. (*Id*.) It was recommended that plaintiff be treated with Sandostatin. His insurance, however, did not cover it and he was recommended to take iron supplements, vitamin C and folic acid. (*Id*.)

On July 3, 2007, plaintiff was seen by Dr. Jason Rasefske for examination to determine his eligibility for disability benefits. (R. at 122.) Plaintiff reported that he has been very fatigued and becomes easily short of breath. (*Id*.) Additionally, he has a significant migraine headache history and the AVMs on his skin and face spontaneously bleed. (*Id*.)

On August 14, 2007, plaintiff was seen at Allegheny General Hospital's emergency room. (R. at 125.) Plaintiff had complaints of weakness and shortness of breath, although he did not report having dark or bloody stools. (*Id*.) Plaintiff stated he was concerned he was having blood loss. (*Id*.) He indicated that he had not had a follow-up examination in about a year due to the loss of his insurance. (*Id*.) Blood tests indicated a hemoglobin level of 12. His stool, however, tested heme positive. (*Id*.) On August 16, 2007, plaintiff was examined by Dr. Marcie Mitre. (R. at 128.) Plaintiff reported that he had upper abdominal discomfort and spontaneous bleeding from telangiectasias on his face and extremities. (*Id*.) Dr. Mitre stated that the heme positive stool was likely from recurrent GI bleeding related to intestinal angioectasias. (*Id*.) Because plaintiff did not have health insurance he refused diagnostic testing. (*Id*.) Dr. Mitre advised plaintiff to stop smoking

and continue to take vitamin C, folic acid and iron supplements and to try to obtain a primary care physician. (*Id*.)

Plaintiff was first seen by primary care physician, Dr. Robert Potter, Jr., on October 8, 2007. (R. at 179.) Dr. Potter indicated that plaintiff's chief complaint was for AVMs and that he needed some disability forms to be filled out. (*Id*.) Dr. Potter indicated that he also treated plaintiff's sister, who has AVMs and GI bleeding. (*Id*.) Other complaints reported by plaintiff were fatigue, malaise, cough, arthritis, back pain and stiffness. (R. at 180.) Dr. Potter noted telangiectasia around plaintiff's mouth, forehead and fingers and that his conjunctiva were pink in color. (*Id*.) Plaintiff reported during a follow-up exam on November 7, 2007, that he was feeling very fatigued and had increased anxiety, difficulty sleeping and loss of appetite. (R. at 176.) Dr. Potter noted that plaintiff's anemia had deteriorated and that his anxiety was new. (R. at 176-78.) Dr. Potter prescribed Lorazepam[8] and Paxil[9] for anxiety and continued the Vicodin for headaches. (R. at 177-78.)

On February 8, 2008, plaintiff was seen by Dr. Potter for a medication check. (R. at 155.) Plaintiff stated that his legs are heavy at times and that he easily tires. (*Id*.) He stated that he has pain from migraines all the time and he used the Vicodin to "take the edge off" as it is the only thing that

_____

[8]Lorazepam is the generic brand of Ativan. "Lorazepam is in a group of drugs called benzodiazepines. It affects chemicals in the brain that may become unbalanced and cause anxiety. This results in a reduction in nervous tension. Lorazepam is used to treat anxiety or anxiety associated with symptoms of depression." http://www.drugs.com/lorazepam.html (last visited 8/30/10). Adverse side effects of Lorazepam include "confusion, depressed mood, thoughts of suicide or hurting yourself; hyperactivity, agitation, hostility; hallucinations; or feeling light-headed, fainting. Less serious lorazepam side effects may include: drowsiness, dizziness, tiredness; blurred vision; sleep problems (insomnia); muscle weakness, lack of balance or coordination; amnesia or forgetfulness, trouble concentrating; nausea, vomiting, constipation; appetite changes; or skin rash." *Id.*

[9]Paxil "is indicated for the treatment of major depressive disorder. . . . obsessive compulsive disorder . . . . panic disorder. . . ." *Physician's Desk Reference* 1536 (63rd ed. 2009). Adverse side effects of Paxil include: "asthenia, sweating, nausea, decreased appetite, somnolence, dizziness, insomnia, tremor, nervousness, . . . . dry mouth, . . . constipation. . . ." *Id.* at 1541.

works for him. (*Id*.) Dr. Potter noted that plaintiff's anxiety and AVM were stable and that his anemia had improved. (R. at 156.) Dr. Potter prescribed Vicodin for headaches and Protonix for reflux. (R. at 156-57.) A follow-up appointment with Dr. Potter on April 17, 2008, indicated that plaintiff was feeling anxious, edgy, impatient and had been very itchy. (R. at 147.) Plaintiff stated he was having lots of financial problems and that he felt like destroying his house before he had to move out. He denied any suicidal ideation. (*Id*.) Dr. Potter reported that plaintiff's depression/anxiety and fatigue had deteriorated. (R. at 149-50.)

Plaintiff was seen for blood work on May 9, 2008. (R. at 139.) Plaintiff reported that he was very worn out and depressed, although he denied any suicidal ideation. (*Id*.) Plaintiff stated he could lift ten pounds but not much more than that. (*Id*.) In a letter dated May 9, 2008, Dr. Potter stated that plaintiff is weak because of his anemia, has major depression and would be unable to perform any type of job for the foreseeable future. (R. at 136.)

On May 1, 2008, plaintiff began mental health treatment at Mercy Hospital. (R. at 296.) Plaintiff stated that he had some thoughts of suicide and thoughts of harm to others, although he denied any plans or actions. (R. at 285, 297.) It was reported by plaintiff that he had recent problems with his judgment and impaired functioning. (R. at 285.) The provisional diagnosis was for depressed mood with a "GAF" of 38.[10] (R. at 285-86.) On May 20, 2008, plaintiff was seen for individual psychotherapy and his GAF was assessed to be 40. (R. at 281.) On July 8, 2008, plaintiff

---

[10] The Global Assessment of Functioning ("GAF") scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function. *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR), 34 (4th ed. 2000). A GAF score between 31-40 indicates "[s]ome impairment in reality testing or communication ( e.g., speech is at times illogical, obscure, or irrelevant ) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school )." *Id*.

stated that the psychiatric medication prescribed by Dr. Potter was helping to make his mood more positive and his GAF was assessed to be 45.[11] (R. at 386-87.) Plaintiff stated he was still depressed and worried about his social security status at his July 22, 2008 session. His GAF was assessed at 40. (R. at 388-89.) On July 31, 2008, plaintiff informed personnel at Mercy Hospital that he was moving to Texas to live with his son and would not be attending any future appointments. (R. at 391.)

A psychiatric evaluation was performed on July 25, 2008, by certified registered nurse practitioner Joanne Connelly ("Connelly"). (R. at 374-76.) Plaintiff stated that he had increasing problems with his temper and irritability due to his financial problems and his separation from his wife. (R. at 375.) Plaintiff was assessed to have anger management problems and mood instability and that he had feelings of hopelessness, helplessness and anxiety. (*Id.*) Plaintiff denied any psychotic symptoms or homicidal or suicidal ideation and his judgment and insight appeared to be good. (*Id.*) Connelly diagnosed plaintiff with mood disorder NOS and having a GAF of 50. (*Id.*) It was recommended that plaintiff be treated with Seroquel[12] and to follow-up with his medical care upon moving to Texas. (R. at 376.)

---

[11]A score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR), 34 (4th ed. 2000).

[12]Seroquel "is used to treat schizophrenia in adults and children who are at least 13 years old. It is used to treat bipolar disorder (manic depression) in adults and children who are at least 10 years old. Seroquel is also used together with antidepressant medications to treat major depressive disorder in adults." http://www.drugs.com/seroquel.html (last visited 8/27/10). Adverse side effects of Seroquel include: "heart failure, sudden death, or pneumonia in older adults with dementia-related conditions . . . . very stiff (rigid) muscles, high fever, sweating, confusion, fast or uneven heartbeats, tremors, uncontrolled muscle movements, feeling light-headed, blurred vision, eye pain, increased thirst and urination, excessive hunger, fruity breath odor, weakness, nausea and vomiting. *Id.*

Dr. Adam Sohnen performed a examination of the plaintiff on July 24, 2008, for the Bureau of Disability Determination. (R. at 300.) Plaintiff was sent to Dr. Sohnen after plaintiff's hearing with the ALJ, because plaintiff's primary care physician was a family practitioner. (R. at 309, 462-63.) Dr. Sohnen is board certified in internal medicine. (R. at 310.) Dr. Sohnen stated that plaintiff had frequent nosebleeds, he did not sleep well, his appetite was fair and he had mild weight loss. (R. at 302.) Plaintiff stated he had crying spells and chest tightness, but denied suicidal ideation. (*Id.*) Plaintiff reported having dark stools, generalized weakness and low back pain. (*Id.*) Dr. Sohnen found plaintiff able to ambulate within the exam room easily without assistance and that he had the ability to touch his toes and crouch and stand back up. (*Id.*) Dr. Sohnen diagnosed plaintiff as having AVM syndrome, depression and fatigue. (R. at 303.) Dr. Sohnen reported that plaintiff's stated limitations were not supported by the exam. The limitations, however, could still be real on the basis of depression and deconditioning. (*Id.*) Dr. Sohnen stated that individuals with AVM syndrome can have a left to right shunt which could cause weakness and fatigue and plaintiff could have the possibility of such a shunt. (*Id.*) If such a shunt was present, Dr. Sohnen opined that it could account for all plaintiff's symptoms. (*Id.*)

Dr. Sohnen assessed plaintiff to have the capability to lift and carry a maximum of twenty pounds and frequently lift ten pounds. (*Id.*) Plaintiff would be limited in standing and walking to one hour. (*Id.*) Plaintiff was not found to have limitations in postural maneuvers and no environmental restrictions were found. (*Id.*) Dr. Sohnen based his assessment on subjective findings of fatigue. If plaintiff, however, had a shunt, that would account for all his limitations. (R. at 303-04.)

Subsequent to plaintiff's hearing before the ALJ, plaintiff was hospitalized at Methodist Hospital in San Antonio, Texas. (R. at 313, 334.) On August 27, 2008, plaintiff went to Methodist Hospital's emergency room complaining of weakness. (R. at 334.) Upon admission plaintiff's hemoglobin was 12, but subsequently dropped to 10. (*Id*.) Plaintiff stated that he had black stools virtually all the time. (*Id*.) Dr. Timothy Osonma, the emergency room attending physician, admitted plaintiff for observation and ordered two units of blood to be transfused. (R. at 335.)

After the ALJ's decision, plaintiff's counsel submitted to the Appeals Council a medical report from a gastroenterology clinic concerning plaintiff's admission to a hospital on February 7, 2009. (R. at 421.) In a letter dated February 12, 2009, Dr. V. Franz Zurita stated that plaintiff was admitted to the hospital on February 7, 2009, due to fatigue. His hemoglobin, however, was 12.1 and he was not anemic. (R. at 427.) An endoscopy was performed which revealed three AVMs in the stomach and fifteen to twenty AVMs in the duodenum that were treated with argon plasma coagulation. (*Id*.) Plaintiff was later seen by a pulmonologist, Dr. Randall Bell, who confirmed an AV shunt from blood gas monitoring with hypocemia.[13] (*Id*.) The CT of the chest did not suggest, however, any clear cut AVM, but did confirm atelectasis.[14] (*Id*.) Dr. Zurita stated that the cause of plaintiff's profound fatigue was unclear and that plaintiff may need further evaluation. (*Id*.) Plaintiff's long-term treatment is to have iron supplementation and hemoglobin monitoring as well as bone marrow stimulants as needed and endoscopies and colonoscopies to treat vascular lesions. (*Id*.) The CAT scan did not document pulmonary shunting with AVMs. AVMS, however, still may

---

[13]Hypoxemia is "subnormal oxygenation of arterial blood." *Stedman's Medical Dictionary,* 939 (28th ed. 2006).

[14]Atelectasis is the "[d]ecrease or loss of air in all or part of the lung, with resulting loss of lung volume itself." *Stedman's Medical Dictionary,* 173 (28th ed. 2006).

be there. (*Id*.) Further testing via angiogram would be the next step. The pulmonary specialist, however, may advise that the risks outweigh the likely benefits at this time. (*Id*.)

*Testimony*

Plaintiff's hearing before the ALJ was held on June 11, 2008. (R. at 431.) During the hearing, plaintiff testified that after his alleged onset date he had several work attempts which were unsuccessful because he could not do the work. (R. at 437-40.) Plaintiff stated that he attempted jobs where he had to align machinery and refuel jets, but was unable to perform those jobs because of his difficulty walking up steps and climbing ladders. (R. at 438-39.) Plaintiff stated that he has fatigue and blood in his stool every day. (R. at 444.) The ALJ repeatedly asked plaintiff if he did, in fact, have dark stools every day since there were records that stated his dark stools were intermittent. (R. at 449-50.) Plaintiff, however, reaffirmed that he had dark stools everyday. (R. at 450.) Plaintiff testified that he had begun seeing a mental health therapist about two to three months prior to the hearing. (R. at 446-47.) Plaintiff stated that due to his fatigue he had trouble walking or standing for long periods of time and he had a hard time climbing steps. (R. at 451.) Plaintiff had trouble sleeping at night and frequently took naps during the day. (R. at 454.) He had trouble focusing on tasks for longer than fifteen minutes and had two or three headaches a day. (R. at 455.) He had crying spells and that his antidepressant medication made him very tired. (R. at 456.)

The VE testified that plaintiff would have transferable skills to light mechanical repair but not to sedentary work. (R. at 459-60.) The ALJ posed a hypothetical to the VE which limited a person to light work, with a sit and stand option that allowed for sitting for four hours and stand and walk for a total of four hours a day. (R. at 460.) The VE stated that such a hypothetical person could perform packing jobs, light assembly and light inspector jobs. (R. at 461.) If the additional

limitations of avoidance of crowds and assembly line pace were added the VE testified that half the packing and assembly jobs would be eliminated. (*Id.*) When asked if the need to take naps and the inability to concentrate for more than fifteen to thirty minutes at a time were added to the limitations, the VE stated that no jobs would be available. (R. at 462.) At the close of the hearing the ALJ stated that because Dr. Potter was a general practitioner, a consultative exam of plaintiff would be needed after the hearing. (R. at 463.)

### Legal Standard

Judicial review of the Commissioner's denial of a claimant's benefits is proper pursuant to 42 U.S.C. § 405(g). This court must determine whether there is substantial evidence which supports the findings of the Commissioner. 42 U.S.C. § 405(g). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). This deferential standard has been referred to as "'less than a preponderance of evidence but more than a mere scintilla.'" *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002) (quoting *Jesurum v. Sec'y of Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). This standard, however, does not permit the court to substitute its own conclusions for those of the factfinder. *Id.* (citing *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

### Discussion

Under the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A); *see* 42 U.S.C. § 423(d)(1)(A). Similarly,

a person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(B); *see* 42 U.S.C. § 423(d)(2)(A).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied. 20 C.F.R. §§ 404.1520, 416.920. The evaluation consists of the following phases: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents her from performing her past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of her age, education, work experience, and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920; *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000). If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled. *Burns*, 312 F.3d at 119. The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process. *Id.*

In the instant case, the ALJ found plaintiff met the insured status requirements of the SSA through December 31, 2012; and with respect to the sequential evaluation found (1) plaintiff had not engaged in substantial gainful activity since October 22, 2005; (2) plaintiff suffers from hereditary telangiectasias with multiple AVMs and chronic anemia; (3) plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20

C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff cannot return to any past relevant work; and (5) plaintiff

has the residual functional capacity to perform light work activity, except that he is limited to

standing four hours and sitting four hours in a workday, and must be afforded a sit-stand option and

there were jobs in the national economy that plaintiff could perform. (R. at 14-23.)

Plaintiff raises three main issues:

1.    Whether the ALJ failed to give proper weight to plaintiff's complaints and plaintiff's
      treating physician's medical source opinion.
2.    Whether the ALJ posed an inaccurate hypothetical question which failed to reflect
      all plaintiff's functional limitations.
3.    Whether the ALJ was biased against plaintiff denying him a fair hearing.

Each of these issues will be addressed.


I.    **Whether the ALJ failed to give proper weight to plaintiff's complaints and plaintiff's
      treating physician's medical source opinion.**

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord

treating physicians' reports great weight, especially 'when their opinions reflect expert judgment

based on a continuing observation of the patient's condition over a prolonged period of time.'

*Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350

(3d Cir. 1987)) . . . . " *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (additional citations

omitted). An administrative law judge must weigh conflicting medical evidence and can chose

whom to credit, but "'cannot reject evidence for no reason or for the wrong reason.'" *Id.* at 317

(quoting *Plummer*, 186 F.3d at 429). An administrative law judge must consider all medical findings

that support a treating physician's assessment that a claimant is disabled, and can only reject a

treating physician's opinion on the basis of contradictory medical evidence, not on the administrative

law judge's own credibility judgments, speculation or lay opinion. *Morales*, 225 F.3d at 317-18.

An administrative law judge must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence, especially when testimony of the claimant's treating physician is rejected. *See Wier ex rel. Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir.1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). He or she must also give serious consideration to the claimant's subjective complaints, even when those assertions are not confirmed fully by objective medical evidence. *See Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993); *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir.1986).

An administrative law judge as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based upon other evidence in the record. *See Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974). If, however, an administrative law judge concludes the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision. *See Cotter*, 642 F.2d at 705. "Once a claimant has submitted sufficient evidence to support his or her claim of disability, the [Commissioner] may not base its decision upon mere disbelief of the claimant's evidence." *Williams v. Sullivan*, 970 F.2d 1178, 1184-85 (3d Cir. 1992) (citing *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir.1981)). The United States Court of Appeals for the Third Circuit has cautioned:

> [T]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability. This Court has said before that an ALJ's personal observations of the claimant "carry little weight in cases . . . involving medically substantiated psychiatric disability."

*Morales*, 225 F.3d at 319 (quoting *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)).

## A. Severe impairments

In addressing plaintiff's arguments the court will first consider whether the ALJ erred at step two of the sequential analysis in finding that plaintiff's headaches and depression did not constitute severe impairments. A "nonsevere" impairment is "[a]n impairment or combination of impairments" that does not "significantly limit[] [the claimant's] physical or mental ability to do basic work activities. . . ." 20 C.F.R. §§ 404.1520(c), 404.1521(a). The United States Court of Appeals for the Third Circuit has stated that the burden to prove an impairment is "severe" is "not an exacting one." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). The finding of a "severe" impairment is viewed as only a *de minimis* screening device to dispose of groundless claims. *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). "If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue." *Id.* (citing *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996 ); *see also* Social Security Ruling 85-28. To that end, impairments will rarely be found to be nonsevere and as such, "its invocation is certain to raise a judicial eyebrow." *McCrea*, 370 F.3d at 361.

At step two, the ALJ found that plaintiff had severe impairments of hereditary telangiectasias with multiple AVMs and chronic anemia. (R. at 16.) The ALJ specifically found that plaintiff's headaches, anxiety and depression did not cause more than a minimal decrease in his ability to perform work activity and therefore were not "severe" impairments under the SSA. (R. at 17.) The ALJ discounted plaintiff's claim that his headaches were a severe impairment because there was no indication of a severe medically determinable impairment causing the headaches. (*Id.*) The ALJ considered that plaintiff had not followed a special treatment for migraines, he took Vicodin on an

as-needed basis, but did not follow a migraine protocol, and the record did not indicate any migraine symptoms such as photophobia and nausea. (*Id.*)

Concerning plaintiff's mental impairments, the ALJ stated:

> I note that the claimant did not allege anxiety and depression as limiting conditions when he filed his claim, and that he did not seek or receive psychotropic medications until after the request for hearing was filed . . . . Likewise, he did not commence counseling at just a few months ago when, according to therapist Mr. Loring (a clinical social worker, not a psychologist), his treating physician recommended that he seek treatment for depressive symptoms and suicidal ideation . . . . The first encounter with the therapist was via telephone on May 1, 2008, at the time his Social Security case was being set for hearing. This tends to suggest that his motivation for treatment is to support his claim for disability, rather than to alleviate symptoms that were poorly documented in the record.

(R. at 17.)

Substantial evidence does not support the ALJ's findings with respect to plaintiff's headaches because he discredited plaintiff's complaints and the medical evidence and appears to rely upon his own lay medical opinion. There is no medical report or opinion discussing plaintiff's need or absence of need for a "migraine protocol." Similarly, there is no medical opinion in the record finding that headaches that lack photophobia or nausea do not cause more than a *de minimis* limitation in the ability to do work. As early as 2002, plaintiff reported to his treating physicians that he had daily headaches and was prescribed Vicodin, an opioid. That treatment by his physicians belies the notion that his headaches did not limit his ability to work.

With respect to plaintiff's mental limitations, the notion that his allegations were made to support his claim for disability is not substantiated by the record. The timing of plaintiff's treatment for depression and anxiety is not medical evidence that contradicts the multiple reports of plaintiff's GAF scores and medical professional's recommendation that he seek therapy and to continue to take

20

medication for anxiety and depression. (R. at 374-76.) There are no reports of concerns of malingering by any medical personal that examined plaintiff and there is no evidence to support the suspicion that plaintiff was seeking treatment to bolster his disability claim. The ALJ's step-two findings with respect to plaintiff's headaches, anxiety and depression are not supported by the record. *See Morales*, 225 F.3d at 318 ("[t]he ALJ cannot, as he did here, disregard this medical opinion based solely on his own 'amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility.'")(quoting *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)). Since plaintiff's limitations arising from his headaches and mental limitations were not carried through the remainder of the sequential analysis, remand is required for the ALJ to reconsider if those limitations singly and in combination with his other severe impairments prevent plaintiff from performing gainful employment.

**B. Dr. Sohnen's report**

Plaintiff argued that Dr. Sohnen's report contained several factual errors. Of note were the statements by Dr. Sohnen that plaintiff's alleged limitations could have been confirmed by the existence of a shunt. (R. at 303.) Subsequent to the ALJ's ruling, plaintiff submitted to the Appeals Council a report that plaintiff was found to have a shunt after blood gas testing. (R. at 427.) The Appeals Council made this report a part of the record. The Appeals Council, however, did not choose to reconsider the ALJ's opinion.

The United States Court of Appeals for the Third Circuit has stated that " when the claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner but only if the evidence is new and material and if there was good cause why it was

not previously presented to the ALJ (Sentence Six review)." *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).[15]

Commissioner argues that the letter stating that plaintiff has a shunt is not material and therefore should not necessitate remand for the ALJ to consider. Plaintiff did not raise this issue or reply to the Commissioner's argument that the letter is not material. In light of remand for the ALJ to reconsider plaintiff's limitations arising form his headaches, anxiety and depression, the ALJ should certainly consider the relevance of the February 12, 2009 letter and weight of Dr. Sohnen's report in light of that letter as well as plaintiff's severe limitations.

## II. Whether the ALJ's hypothetical question failed to reflect all plaintiff's limitations

Plaintiff's raised the issue whether the ALJ's hypothetical question to the VE failed to reflect accurately all plaintiff's limitations, namely that the ALJ's question did not include limitations of severe fatigue. The hypothetical posed by the ALJ was for a person limited to light work, with a sit and stand option that allowed for sitting for four hours and stand and walk for a total of four hours a day. (R. at 460.) Where a hypothetical question posed to the vocational expert accurately sets forth all a claimant's significant impairments and restrictions in activities, physical and mental, as

---

[15]Section 405(g) provides in relevant part:

The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g).

found by the administrative law judge or as uncontradicted on the medical record, the expert's response about the existence of jobs in the national economy which the claimant is capable of performing may be considered substantial evidence in support of the administrative law judge's findings on the claimant's residual functioning capacity. *See Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir.2002). Because the analysis at step two was erroneous, the ALJ's findings and hypothetical question may have failed to reflect all plaintiff's limitations. As a result the hypothetical question relied on by the ALJ was not supported by substantial evidence.

### III.     Request for a different administrative law judge

Plaintiff claims that the ALJ exhibited bias towards him and on remand the Commissioner should be ordered to reassign the case to a different administrative law judge. The United States Court of Appeals for the Third Circuit has stated that remand to a different administrative law judge ALJ is appropriate where bias against the claimant has been proved. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995)(citing *Hummell v. Heckler*, 738 F.2d 91 (3d Cir. 1984)). An unbiased judge is essential to a fair hearing and is a requirement applied more strictly in administrative proceedings due to the absence of procedural safeguards available in judicial proceedings. *Id*. at 902. The court of appeals has held that were there is coercive, intimidating and offensive conduct by an administrative law judge that prevented claimant from receiving a full and fair hearing the claimant is entitled to a new hearing before another administrative law judge. *Id*. at 904.

Plaintiff raised the issue with the Appeals Council. (R. at 423.) Plaintiff alleges bias by the ALJ was exhibited in the following exchange at the hearing:

ALJ.            Now, I want you to tell me the truth now.
Claimant.      Yes sir.
ALJ.            Because I have the records here that show what the truth is.
Claimant.      Uh-huh.

| ALJ. | So when you say you have dark stool every day, do you have dark stool every day? |
|---|---|
| Claimant. | Yes, I do, sir. |
| ALJ. | Okay.  That's not what it says here. |
| Claimant. | Well, I see it every day. |
| ALJ. | Well, that's not what you told the doctors. |
| Claimant. | Well, that's not, that's not correct then, because I do have dark stool every day. |
| ALJ. | So you lied to the doctors. |
| Claimant. | What doctors are you talking about there? |
| ALJ. | A lot of doctors.  When you went to the hospital.  The other doctors. |
| Claimant. | Well, I have dark stool, sir.  I used to take my stool samples to a cancer doctor out in - - |
| ALJ. | I'm not saying you don't have dark stools.  I'm saying you don't have it every day, is that right, or do you have it every day? |
| Claimant. | Well, with the iron pills I take, sir, it's black.  Yes, sir, it's black every day. |

(R. at 449-50.)

While the court recognizes that this line of questioning was forceful and of questionable relevance, there is no indication that the ALJ was biased against claimant.  It is the role of an administrative law judge to evaluate the credibility of witnesses at the hearing and he or she is free to pose questions that may help in determining credibility.  *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).  Based upon a review of the record in its entirety, this court cannot find the ALJ was biased.  Under those circumstances, there is no need to order that a new administrative law judge conduct a hearing.

Plaintiff asks this court in lieu of remand to reverse with instructions for the Commissioner to award benefits.  The district court, however, should only order an award of benefits when "the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits."  *Podedworny v.*

*Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). As discussed above, the record may not be fully developed with respect to Dr. Sohnen's opinions which may resolve inconsistences that the ALJ originally found in the record. As a result, remand for further consideration is required in this case.

### *Conclusion*

After consideration of the cross-motions for summary judgment and the record as a whole, the court finds that substantial evidence does not exist in the record to support the ALJ's conclusion that plaintiff does not have a "disability" as defined in the SSA. The cross-motions for summary judgment are **DENIED**. This case is remanded to the Commissioner for further consideration consistent with this opinion.

An appropriate order follows.


By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated:          August 30,  2010